# Federal Defenders
## OF NEW YORK, INC.

Southern District
81 Main Street, Suite 300
White Plains, NY 10007
Tel: (914) 428-7124 Fax: (914) 948-5109

---

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

July 9, 2024

The Hon. Nelson S. Román
United States District Judge
300 Quarropas St.
White Plains, New York 10601

      Re:    **Re: *United States v. Victor Byrne* 22-CR-444 (NSR)**

Dear Judge Román,

      I am submitting this sentencing letter to request a sentence of seven years for Victor Byrne. This sentence is sufficient but not greater than necessary under 18 U.S.C. § 3553(a) for several reasons, including Mr. Byrne's total lack of *any* criminal activity since the offense conduct 18 and 16 years ago, his complete remorse for his appalling conduct, and his low recidivism risk as confirmed by a psychosexual evaluation.

    **I.**    **Mr. Byrne's history and characteristics support a sentence of no more than seven years**

      Mr. Byrne was born in 1966 in Mexico. He had an unusual childhood in that he was born into a circus family. His alcoholic father left when he was very young, so he, his mother, and his brother toured with his maternal grandparents' traveling circus. He began working at age 5, which was exciting but chaotic, and filled with physical and mental pitfalls. For example, Mr. Byrne was mauled by a lion at age 4 or 5 and almost died. PSR ¶ 82. But these physical dangers paled in comparison to the emotional and psychological hazards to young Mr. Byrne's well-being.

      The traveling circus culture involved blurred social norms, misogyny, and unmitigated "locker room talk." *See* Report from Angel L. Bosques Jr., Federal Defender social worker, attached at Ex. A-1. This culture had "profoundly negative effects on Mr. Byrne's views on sex and sexuality." *Id.* As a child, Mr. Byrne was forced by young adults to touch unsuspecting women and was rewarded with candy for doing so. *Id.* From circus culture, he learned masculinity was defined by "overall dominance" and large numbers of sexual partners. *Id.* at 2.

[redacted]

ged.

His mother eventually remarried. His stepfather was a good man, but the family still struggled financially. Mr. Byrne and his family would often sleep in tents or temporary shelters. PSR ¶ 70. His mother and stepfather did the best they could, but they were very poor. When Mr. Byrne was about 10 or 11, the family stayed during the school year in Sarasota, Florida. Here, Mr. Byrne was often ridiculed for his poverty, which the other kids gleaned from his ill-fitting, second-hand clothes. PSR ¶ 70. He also was a native Spanish speaker thrown into a public school. His halting English cemented his outcast status.

Eventually, the family left the circus, settling in Suffern, New York, so the children could have some sense of normalcy. His childhood neighbor, Bridget Kuczynski, has remained his friend for over 40 years. In her letter to the Court, she remembers "being so enthralled" when she observed her new neighbors "riding unicycles and doing tricks from their days in the circus." Letter to Court from Bridget Kuczynski, attached at Exhibit C. All was not fun and games, however. Ms. Kuczynski remembers learning from young Mr. Byrne about his difficult past, including abandonment by his father, profound poverty, lack of stability, and bullying. *Id*.

Drawing on his circus training, Mr. Byrne became a successful diver in high school. After his high school graduation in 1984, he worked steadily in various capacities that utilized his acrobatic skills, including teaching karate. PSR ¶ 119-120. He also helped run his family's restaurant, Guadalajara Restaurant in Monsey, New York, which was on the bottom floor of the family's apartment. *Id*.

In 1994, tragedy struck when his stepfather was diagnosed with lymphoma and died very quickly. Mr. Byrne stepped in. He comforted his grieving mother, supported his step-siblings, who were still in high school, and did his best to take over the family restaurant, which was already struggling financially. PSR ¶ 118.

His mother, Aurora, recalls that Victor was integral to her ability to continue after her husband passed. She recalls how she cried "all day everyday" and "could not function." Letter to Court from Aurora Chantal, attached at Exhibit E. She explains that "Victor took on the responsibility of [the] restaurant and [his] siblings" by making sure "they all went to school and did their homework." *Id*. She credits Victor with helping "all my kids through all this disaster." *Id*. Indeed, his sister Patricia, interviewed by Probation, confirmed that Mr. Byrne "essentially raised his two younger half-siblings." PSR ¶ 82.

Yet another childhood friend, Vincent Altieri, now a lawyer and retired state judge, recalls that after the restaurant folded, the family was evicted from their home, which was above the restaurant. Letter to Court from Vincent Altieri, attached at Exhibit F. Mr. Altieri recalls that "Victor arranged suitable housing for the entire family," thereby "enabling 4 of his siblings to finish school, 3 of whom became police officers." *Id*.

*United States v. Byrne*, 22 Cr. 444 (NSR)
Page 3

In addition to his own siblings, he also helped raise his niece and nephew. His niece, Dellana Perez, recalls that he was a "father figure" to her because her own father was largely absent. Letter to Court from Dellana Perez, attached at Exhibit D. She recalls: "he made sure we went to school and even drove me to school when I missed the bus." *Id.* at 1. She recalls that when she decided to join the Air Force, from which she eventually retired after 21 years of service, "he was the one I called to share my good news." *Id.* at 2. She explains that without his encouragement, she would never have had her 21-year career in the Air Force. *Id.*

Eventually, in about 2002, he became a diving coach at Suffern High School. PSR ¶ 113. He then opened up a diving business where he coached multiple divers in and around the New York area. It was during this period (2006 and 2008) that the offense conduct occurred, discuss *infra*.

In most other criminal cases, the defendant's "history and characteristics" section ends here, with an arrest. For Mr. Byrne, however, the Court has the benefit of observing his conduct from 2008 through August 31, 2022, when he arrested for the instant conduct, which occurred 15 years prior. *He was never accused or any sexual wrongdoing at any point during these intervening years*.

From 2010 to 2021, he opened up his own sports businesses in Connecticut. PSR ¶ 112. Then, in 2021, he moved to Florida hoping to start a new business there. Given pandemic restrictions, he ultimately decided to apply to different types of jobs, including being a coffee barista and TSA agent. PSR ¶¶ 108-111.

To reiterate, in the 14 years between his 2008 conduct and his arrest, he never again committed an offense. He worked, supported himself, participated in long-term age-appropriate relationships, and had no contact with law enforcement.

II. **The nature and circumstances of the offense conduct was appalling, and Mr. Byrne has accepted full responsibility for it.**

Mr. Byrne has accepted responsibility for two offenses, which occurred 18 and 16 years ago, respectively:

The first offense occurred in July 2006, 18 years ago. Mr. Byrne takes full responsibility for transporting a minor to engage in illegal sexual activity, in violation of 18 U.S.C. § 2423(a). This offense carries a five-year mandatory minimum.

The second offense occurred in February 2008, 16 years ago. Mr. Byrne takes full responsibility for transporting a person for illegal sexual activity, in violation of 18 U.S.C. § 2412. This offense carries no mandatory minimum, and can be punished by a maximum term of prison of 10 years.

Mr. Byrne's letter to the Court, attached at Exhibit B, demonstrates insight

into his offense conduct and clearly states his deep remorse for his conduct. He acknowledges that he used his position of authority to coerce two of his diving students into inappropriate sexual relationships. He explains:

> **Words cannot describe the shame I feel and how I would do anything to take back my actions**. Obviously, I can't. But I understand how I physically and emotionally changed their lives for the worse. I took advantage of my position as their coach. I did not think about the terrible consequences that my actions would have on them. **I agree that what I have done requires a grave punishment.**

Letter to Court from Victor Byrne, attached at Exhibit B (emphasis added).

After the offense conduct, he realized how he had improperly exercised his power over the two victims, much like the adults in his childhood exercised their power over him.

> I have done everything I can to change as a person. I started a new path and new life. But I know that the victims couldn't leave their trauma behind as easily. And for that and the way I acted, I am truly sorry.

*Id*. He vowed never to again engage in such conduct. He has kept that promise.

### III. Mr. Byrne's recidivism risk is extremely low

Mr. Byrne submitted to a psychosexual evaluation by Dr. Alexander Bardey, who conducted multiple risk assessment tools and found Mr. Byrne is unlikely to recidivate. Dr. Bardey's Evaluation is attached at Exhibit A.

    a. *Mr. Byrne's risk of recidivism is extremely low*

Dr. Bardey first examined Mr. Byrne using STATIC-99R, which is "an actuarial instrument designed to estimate the probability of sexual and violent recidivism among adult males who have been charged with or convicted of at least one sexual offense against a child or non-consenting adult." Ex. A at 9. STATIC-99R is the most common actuarial-based static risk instrument for sexual recidivism.[1] It uses objective demographic and criminal history information to measure the relative risk for sexual recidivism.[2] The factors included in this tool assess demographics,

---

[1] *See* Kelley *et al.*, (2020) How do professionals assess sexual recidivism risk? An updated survey of practice. *Sexual Abuse: Journal of Research and Treatment*, 32(1), 3-29.

[2] Helmus, L. M., Kelley, S. M., Frazier, A., Fernandez, Y. M., Lee, S. C., Rettenberger, M., & Boccaccini, M. T. (2022). Static-99R: Strengths, limitations, predictive accuracy

criminal history, and victim characteristics.[3] Mr. Byrne received a score of 0 on the STATIC-99R, which means he is in the "Below Average Risk" category of being charged or convicted of another sexual offense. Ex. A at 9. This score is based on his previous long-term romantic relationships with adult women and total lack of prior criminal sanctions. Ex. A at 9-10. Plus, Mr. Byrne is 58 years old. When he turns 60 (which will happen in prison), his score decreases by an additional two points, placing him in the lowest category for recidivism risk.

Dr. Bardey also found that Mr. Byrne does not have pedophilia or any other paraphilia or sexual deviancy. Rather, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. A at 12.

Furthermore, Dr. Bardey outlined several mitigating factors "which help further diminish his risk," such as "lack of involvement or interest in child pornography," "interest in and capacity for appropriate relationships with adult women," and a "lack of inherently psychopathic and/or sadistic personality traits or tendencies." Ex. A. at 12.

Dr. Bardey also concludes that participation in sex-offender specific psychotherapy "will help increase Mr. Byrne's insight into the psychological underpinnings of his offense conduct, develop prosocial avenues for meeting his psychological needs, and accept full responsibility for his actions." Ex. A at 14. Such treatment will be provided by the Bureau of Prisons and Probation.

    b. *Mr. Byrne's good behavior since the charged conduct confirms he is unlikely to recidivate*

There is no evidence Mr. Byrne has engaged – or attempted to engage – in similar conduct since the charged conduct. Ex. A at 13. Indeed, the Department of Homeland Security's ("DHS's") intense investigation into Mr. Byrne's conduct confirmed as much. DHS conducted dozens of interviews regarding Mr. Byrne's behavior, including multiple former divers.[4] No other person interviewed by DHS accused Mr. Byrne of engaging in illicit sexual contact in the years since the offense conduct.

According to Dr. Bardey, Mr. Byrne's illicit conduct was limited to just two victims because several factors conflated. Specifically, these young women had strained relationships with their own families. Mr. Byrne had built trusting relationships with their parents, even residing with one victim's family for some time. According to Dr. Bardey, because these young women had strained relationships with their own families, they became more reliant on Mr. Byrne's training and

---

meta-analysis, and legal admissibility review. *Psychology, Public Policy, and Law, 28*(3), 307–331.
[3] *Id.*
[4] Stevie Meyerson, Ellen Proctor, Victoria Arturi, Eliana Scobey, Lauren Zucconi.

recommendations than other divers. These factors led to "the development of a dynamic between Mr. Byrne and the victims that qualitatively differed from his relationships with other students." Ex. A at 14. Dr. Bardey concludes that these factors are unlikely to repeat themselves again during his lifetime, reducing any possibility that he will reoffend. *Id*.

The absence of recidivating conduct is particularly notable because Mr. Byrne has also continued to work with children and young adults. Dr. Bardey concludes that his jobs in diving and trampoline parks, "stem authentically from his own athletic abilities and interests," rather than representing an intentional targeting of spaces where children are likely to be. Ex. A at 13.

  c. *Mr. Byrne's support system is a mitigating factor against recidivism*

Mr. Byrne's "strong familial support' will "help further diminish his risk." Ex. A. at 12. Indeed, Mr. Byrne has told all of his family and friends about his past crimes and his current incarceration. To a person, they remain staunch supporters.

His niece confirms that his family will welcome him back after incarceration, noting that she hopes "he will be given a second chance at making life right and return back home to us, his family." Letter from Dellana Perez, at Exhibit D. Likewise, his childhood friend looks back at their 40-year friendship and opines that his childhood "left a big void in him, giving him very low self esteem," which "really impacted his decision making." Bridget Kuczynski Ltr. at 1 (Exhibit C). Ms. Kuczynski does not excuse his mistakes, but emphasizes that she believes him to be "a very kind, loving, and generous person" who "would always be the first to help anyone in need and lend a helping hand." *Id*. at 2.  His sister, Patty, echoes these sentiments. PSR ¶ 82 (confirming that they still "speak several times a month" and that she believes he is "a good person").

In short, his friends and family have remained supportive and will continue to do so upon his release from incarceration.

## IV. The Guidelines do not merit deference in this case

  a. *U.S.S.G. § 2G1.3 is not based on empirical evidence*

The United States Sentencing Commission is required to use empirical evidence and a very technical process when drafting the guidelines to ensure that the Guidelines reflect the factors in 18 U.S.C. § 3553(a). *Rita v. United States*, 551 U.S. 338, 348 (2007).

To achieve these goals, the 1987 Sentencing Commission began the Guidelines-promulgation process with "an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." *Id*. at 349. The Commission "base[d] its determinations on empirical data and national experience, guided by a

professional staff with appropriate expertise." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007).

Issuance of the resulting Guidelines did not mark the end of the Commission's "empirical approach." *Rita*, 551 U.S. at 349. Rather, "[t]he Commission's work is ongoing," and the Guidelines undergo "continuous evolution." *Id.* at 350. As district courts provide explanations for imposing non-Guidelines sentences and circuit courts subject those explanations to reasonableness review, the Commission "collect[s] and examine[s] the results," using this trove of data to "revise the Guidelines accordingly." *Id.* at 350. The Commission also "obtain[s] advice from prosecutors, defenders, law enforcement groups, civil liberties associations, experts in penology, and others," all in an effort to determine whether—and ensure that—the Guidelines are serving the "§ 3553(a) objectives." *Id.* at 348, 350.

This long and technical process ensures that "in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough*, 552 U.S. at 109. But not all guidelines result from this technocratic process. In a handful of cases, the Commission has based guidelines not on "empirical data and national experience," but on statutory directives from Congress. *Id.* at 109. The Supreme Court has recognized that because guidelines of this type "do not exemplify the Commission's exercise of its characteristic institutional role," they are less likely to further "the purposes of sentencing set forth in § 3553(a)." *Id.* at 109-10. And as a result, a district court need not afford those guidelines as much weight or as much deference as it would guidelines that result from the Commission's normal data-driven procedures. *Id.*

In the instant case, the applicable guideline (U.S.S.G. § 2G1.3) is not based on empirical evidence. When the Guidelines were first published in 1987, the base offense level for Mr. Byrne's 2006 conduct was 16, not 28. See U.S.S.G. § 2G1.2 (applicable guideline in 1987 for the instant conduct). The Guideline's base offense level raised slightly between 1987 to 2003. But, even in 2003, the base offense level was just 19, a full nine levels below the current base offense level of 28. So what happened?

First, in 2003, Congress enacted the "Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act" (the "PROTECT Act"), which established a wide variety of mandatory minimum sentences where none had previously been present. See PROTECT Act, Pub.L. No. 108-21 § 103, 117 Stat. 650, 653 (2003). In the PROTECT Act, Congress--for the first time and the only time to date--made direct amendments to the Guidelines. *United States v. Henderson*, 649 F.3d 955, 962 (9th Cir. 2011) . Under the PROTECT Act, Congress rewrote the guidelines for possession of child pornography, such that the base offense level for plain possession of child pornography skyrocketed, and Congress increased the mandatory minimums across the board. The Act left the Commission with little choice

but to increase the surrounding guidelines accordingly. Otherwise, the Commission would lose credibility as its Guidelines would continuously come in "under" the mandatory minimum. *United States v. Dorvee*, 616 F.3d 174, 186 (2d Cir. 2010) (noting that guideline enhancements "cobbled together" through congressional directives "routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases.").

So, to account for the new mandatory minimum sentences and "keep up" with the sky-high child pornography guidelines, the Commission increased § 2G1.3 to base offense level of 24 (Sentencing Guidelines Appx C, Amendment 664).

Then, in 2006, Congress passed the Adam Walsh Act, Pub. L. 109-248. Again, like the 2003 act, the Adam Walsh Act contained a directive to the Commission to enhance penalties for existing offenses. Specifically, Section 203 added a new sentencing range of 18 U.S.C. § 2423: "10 years or for life," thereby creating a new 10 year mandatory minimum term. *Id*. And once again, to keep up with Congressional penalties, the Commission's 2008 Guideline contained an increased base offense of 28 for Mr. Byrne's offense. *See* U.S.S.G. 2G1.3. Stated differently, Congress alone is responsible for the staggering almost 60% increase in the guideline's base offense level.

In sum, the tremendous base-offense-level increase was not based on empirical evidence. Rather, from 1987 forward, this Guideline and other sexual offense guidelines were repeatedly amended at the direction of one political branch of government – Congress – without the benefit of the Sentencing Commission's expertise. *Dorvee*, 616 F.3d at 184-86. As this Court knows, where the sentencing guideline is based on a congressional directive and not on empirical evidence, the Court need not defer to the guideline. *Id*.

Indeed, the Commission itself has also noted that "specific directives to the Commission to amend the guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress." *See* United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform, supra,* at 73. 5

Here, Section 2G1.3's history demonstrates that the Sentencing Commission failed entirely to apply an empirical approach.

---

5 Available at http://www. ussc.gov/15_year/chap2.pdf (last visited April 15, 2024).

> b. *The Guidelines utterly fail to account for the 14-year gap between his conduct and arrest, during which he demonstrated self-motivated rehabilitation by engaging in no criminal conduct*

Mr. Byrne's demonstrated self-motivated rehabilitation is direct and relevant evidence of "the need for the sentence imposed ... to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; [and to] provide the defendant with needed educational or vocational training ... or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(B)–(D). *United States v. Robertson*, 662 F.3d 871, 878 (7th Cir. 2011)

It is well-settled that self-motivated rehabilitation, as opposed to post-arrest rehabilitation, is the gold standard. In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court noted that it was reasonable for the district court to attach "great weight" to a defendant's decision to change his life and voluntarily withdraw from a drug distribution conspiracy, explaining: "Compared to a case where the offender's rehabilitation occurred after he was charged with a crime, the District Court here had greater justification for believing [the defendant's] turnaround was genuine, as distinct from a transparent attempt to build a mitigation case." *Id.* at 57. The Court concluded that self-motivated rehabilitation "lends strong support to the conclusion that imprisonment [is] not necessary to deter [a defendant] from engaging in future criminal conduct or to protect the public from his future criminal acts." *Id.*; *see also United States v. Walker*, 918 F.3d 1134, 1148 (10th Cir. 2019) (internal citations omitted) (affirming 33-day sentencing for two time bank robbery because of his self-motivated rehabilitation, noting "Mr. Walker's self-motivated rehabilitation, including his sustained period of sobriety and the positive changes that he had made in his life" supported such a drastic variance, emphasizing that "a defendant's self-motivated rehabilitation may lend strong support to the conclusion that imprisonment is not necessary to protect the public from his future criminal acts).

Self-motivated rehabilitation is even more persuasive when there is a long gap between the offense conduct and arrest. For example, in *United States v. Robertson*, 662 F.3d 871, 878 (7th Cir. 2011), the Seventh Circuit remanded a case for the district court's failure to consider that the defendants "had rehabilitated themselves of their own accord." *Id.* at 878. There, like in the instant case, the government did not charge the defendants with their crimes until nearly ten years had passed. *Id.* By the time they were sentenced, twelve years had passed since their offense conduct. At sentencing, the defendants "presented unusually strong evidence of their self-motivated efforts to rehabilitate themselves," including "refrain[ing] from committing any other criminal offenses." *Id.* The defendants' almost spotless record "over a

'relatively significant amount of time,'...'demonstrate[d] to the Court and to society, that they can stay out of trouble.'" *United States v. Robertson*, 662 F.3d 871, 879 (7th Cir. 2011).

Here, about 14 years separates Mr. Byrne's offense conduct from his arrest. He rehabilitated himself not because of any arrest, but because he took stock of his poor life choices and realized he needed to change. Yet, this self-motivated rehabilitation is nowhere accounted for in the Guidelines. Such an enormous gap in time between offense conduct and arrest – with no intervening criminal activity – supports a sentence of no more than 7 years.

V. **Mr. Byrne has endured significant punishment, and will continue to do so in the Bureau of Prisons**

Mr. Byrne's pretrial incarceration has been more punitive than usual. He was arrested in Florida on August 31, 2022 and endured two months of prison transfers on his way to New York. During this time, he contracted a terrible case of COVID while at the notorious vermin-infested Oklahoma transfer center. There, he received no medical care, was in total isolation, and stayed weeks longer than normal.

Since his arrival at Westchester County Jail in Fall 2022, his health has deteriorated significantly. PSR ¶ 90. Prison records indicate that  e has received neither. PSR ¶ 90. Even if the Court imposes the lowest possible sentence, he will serve 3 more years in the Bureau of Prisons where medical care is paltry at best, particularly for older incarcerated people like Mr. Byrne.

Additionally, this conviction will have tremendous collateral consequences because he will be a first-time felon and a registered sex offender. His face and address will be on the New York State website for registered sex offenders. He will not be able to work again in any of the industries in which he established himself, including the trampoline park and adventure park that he helped to open. He will lose his right to own a gun and his right to vote. This arrest has been life-shattering, particularly so because he has no prior experience with the criminal justice system.

## CONCLUSION

Mr. Byrne is a 58 year old man who made unforgivable mistakes almost 15 years ago, but has led a law-abiding life since then. Three of the four sentencing goals – deterrence, rehabilitation, and incapacitation – are not at issue here. The only

*United States v. Byrne*, 22 Cr. 444 (NSR)
Page 11

remaining sentence goal is retribution. To that end, he has been shamed in the media and by his family. He has expressed tremendous remorse. He was arrested 15 years after the offense conduct, he has spent the past two years in harsh pretrial detention, all the while suffering significant health setbacks. He has no criminal history, but this single conviction will make him a felon and guarantee a lifetime on the sex offense registry. He will spend the next three years in the Bureau of Prisons, followed by an onerous term of supervised release. For all these reasons, a sentence of no more than 7 years followed by significant supervised release constitutes retribution that is sufficient but not greater than necessary.

      Thank you for your consideration of this request.

                                            Sincerely,

                                            Rachel Martin, Esq.
                                            Assistant Federal Defender
                                            Attorney for Victor Byrne

cc: Marcia Cohen, Esq.