# Federal  Defenders
## OF NEW YORK, INC.

Southern District
81 Main Street, Suite 300
White Plains, NY 10007
Tel: (914) 428-7124 Fax: (914) 948-5109

Tamara Giwa
*Executive Director*

Jennifer  L. Brown
*Attorney-in-Charge*

August 7, 2024

The Hon. Nelson S. Román
United States District Judge
300 Quarropas St.
White Plains, New York 10601

Re:    **Reply sentencing letter:  *United States v. Byrne* 22-CR-444
Sentencing:  September 6, 2024 at 3:30 p.m.**

Dear Judge Román,

The government has requested a 22-year prison sentence for a 58-year old man whose crimes of conviction occurred in 2006 and 2008. This request is shocking and troubling for those reasons alone, but even more so given his lack of criminal history, his significant health problems, and his immediate and complete acceptance of responsibility.

**1. Average life spans decrease substantially for incarcerated individuals with chronic conditions; thus, for Mr. Byrne, who is 58 years old, the government's requested 22-year will be a sentence.**

The current life expectancy for men in the United States is around 76 years. *See* U.S. Dep't of Health and Human Services, Health, United States, 2016. This generalized calculation does not account for the specific factors which will likely shorten Mr. Byrne's own life expectancy, including his systemic illnesses and his incarceration. Extended imprisonment reduces an individual's projected life expectancy for a variety of reasons, including increased stress, poor diet, limited ability to exercise, unclean living conditions, and greater exposure to disease and violence. These issues are exacerbated as an individual ages: imprisonment is far more stressful and difficult for the elderly.  The elderly are more prone to abuse and predation in prison, they need more frequent medical care, they often require special physical accommodations (as their mobility, vision, and hearing diminish), and they experience greater emotional distress and often have difficulty forming social relationships with younger inmates.

1

The effects on an individual are extreme: one study reported that twenty years in prison could reduce an individual's life expectancy by sixteen years. *See* Ira Silverman & Manuel Vega, Corrections: A Comprehensive View (West Publishing Co. 1996). The Second Circuit has recognized that while we cannot predict with certainty how long someone will live, "as a statistical matter, the life expectancy of an incarcerated person drops significantly for each year of incarceration." *United States v. Jenkins*, 854 F.3d 181, 186 n.2 (2d Cir. 2017) (citing Evelyn J. Patterson, The Dose–Response of Time Served in Prison on Mortality: New York State, 1989–2003, 103 Am. J. of Pub. Health 523, 526 (2013)). Thus, an extended prison term both increases the suffering of the aged and reduces their life expectancy.

Even the Department of Justice recognizes this issue, finding that inmates "physiological age averages 10 to 15 years older than his or her chronological age." Office of the Inspector General, U.S. Dep't of Justice, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons, 1–2 (May 2015) ("OIG Aging Inmate Report").[1]
.

As applied to Mr. Byrne, records from the Westchester County Correctional Facility verify that he was diagnosed with Lupus (Systemic lupus erythematosus) in 2023, diabetes (type 2), hyperglycemia, hyperlipidemia, hypertension, rosacea, and neurological atypical facial pain. For these conditions, he is presently prescribed Insulin Glargine 100unit/mL subcutaneous solution 15 units once daily, Insulin 100unti/mL injection solution once daily, metformin 1,000mg tablet twice daily, Lisinopril 10mg tablet once daily, and atorvastatin 20mg tablet once daily. PSR ¶ 90.

In August 2023, the defendant requested an outside consult due to jaw pain. medication was prescribed for short-term pain management. His annual physical notes from October 2023 report that a night guard and surgery were "pending." PSR ¶ 90. He has received no follow up care for his jaw pain.

Exacerbating the problem is the BOP's notoriously poor medical care for inmates with chronic medical conditions, such as Mr. Byrne. *See*, e.g., Walter Pavlo, "Federal Bureau of Prisons' Medical Care Falls Short Of Its Own Policy," Forbes (Apr. 19, 2022) (discussing Office of the Inspector General reports of BOP's lack of any system to track medical care needs, such as length of time to take an inmate to a necessary outside medical appointment).[2]

Courts have recognized repeatedly that because of the vagaries of staffing shortages, funding issues, security issues, and administrative failures, federal inmates are not able to receive the consistent care needed to keep a chronic medical condition from becoming an acute medical condition. *See, e.g.,* United States v. *Topps*,

---

[1] Available at https://oig.justice.gov/reports/2015/e1505.pdf (last visited Jul. 18, 2023).
[2] Available at https://www.forbes.com/sites/walterpavlo/2022/04/19/federal-bureau-of-prisons-medical-care-falls-short-of-its-own-policy.

17-CR57 (SLG) (D. Alaska Oct 24, 2022), ECF No. 96 (BOP unable to treat chronic medical issues of 63 year old defendant with obesity, heart disease, hypertension and a urological condition); *United States v. Thrower*, 495 F. Supp. 3d 132, 137 (E.D.N.Y. 2020) (noting BOP's inability to care consistently for defendant suffering from dementia, cognitive deficits, hypertension, and diabetes); *United States v. Beras*, 2020 WL 7496354, at *2 (S.D.N.Y. Dec. 20, 2020) (noting BOP's inability to care for defendant's chronic conditions—including hypertension, hyperlipidemia, glaucoma, and chronic nasal infection); *United States v. Rice*, 2020 WL 4505813, at *3 (S.D.N.Y. Aug. 5, 2020) (finding that BOP was unable to care for defendant's medical conditions, including lymphoma, chronic angle-closure glaucoma, chronic obstructive asthma, COPD and hypertension). The United States Sentencing Commission's recent amendment to the Sentencing Guidelines that adds a category of "medical conditions requiring long-term care" to the bases upon which a Court can reduce a defendant's sentence demonstrates the Commission's awareness of the BOP being unable to provide such care adequately. *See* Amend. 814, U.S. Sentencing Commission (Apr. 2023).

Mr. Byrne will likely not survive a 22-year sentence. While his crimes merit punishment, dying in prison is a greater punishment than is necessary.

## 2. The government's requested sentence does not reflect this case's procedural history and calls into question the USAO's mitigation process.

### a. To reduce continued victim trauma and conserve judicial resources, Mr. Byrne cooperated with every aspect of this prosecution.

Mr. Byrne was interviewed by law enforcement in Orlando, Florida on May 26, 2022. He cooperated fully in that interview. He was arrested on September 14, 2022, also in Florida. He did not resist arrest in any way. He was transferred to the Southern District of New York and arraigned on November 7, 2022. He never asked for bond, despite the fact that he would have been a terrific candidate for it given his poor health, lack of criminal record, and the many years since the offense conduct. He did not ask for bond because he knew he had committed crimes and recognized prison was a certainty.

He did not file any motions, such as a laches motion because of undue delay. He did not move to suppress any evidence, nor did he indicate at any time that he wanted to go to trial. Further, he did not make the victims testify at a trial, which would have been his constitutional right. Rather, he cooperated with every aspect of the government's case, never putting up a fight. And yet, the government is asking for the equivalent of a life sentence. Notably, if he had gone to trial, the recommended sentence would have been a distinction without a difference: both would result in him likely dying in prison.

3

In short, the government's recommendation does not account for his immediate acceptance of responsibility.

> *b. The plea negotiations in this case deny Mr. Byrne the benefit of the bargain.*

Mr. Byrne was initially charged with a crime carrying a ten-year mandatory minimum. Defense counsel submitted a mitigation request that Mr. Byrne be permitted to plead guilty to an offense that carries a 5-year mandatory minimum. The government agreed and reduced the charge.

Defense counsel represented to Mr. Byrne that with this offer, the government was indicating its belief that a 5-year mandatory minimum *could* be sufficient but not greater than necessary. After all, if the government did not believe as much, it would not have reduced the charge. Because of this reduction in charge – and only because of this reduction in charge – I advised Mr. Byrne to plead guilty pursuant to a plea agreement – instead of a *Pimentel*, which – of course – would have preserved his appellate rights.

Now, Mr. Byrne has pleaded guilty to a plea agreement, waiving his appellate rights, and the government has requested a sentence 18 years higher than the mandatory minimum. He cannot appeal the requested sentence, which is atypical in its severity. The government may not have intended to precipitate a "bait and switch," but the procedural history of this case is a warning siren for future defendants in this district.[3]

## 3. The government's myriad efforts to impugn Mr. Byrne's acceptance of responsibility fall flat.

> *a. Mr. Byrne limited his allocution to the offense elements on advice of counsel.*

The government makes much of Mr. Byrne's plea allocution. Government Letter to Court at 15 ("At the plea proceeding, Byrne declined to admit anything beyond the bare facts necessary to establish the elements of the offenses.").

Mr. Byrne's allocution was based on advice of counsel. My office's policy is for our clients to plead to the elements only. The Court cannot and should not hold him responsible for my legal advice.

> *b. Mr. Byrne does not have perfect recall of the offense conduct because the government waited years to bring charges.*

---

[3] Additionally, Mr. Byrne will have a stronger-than-usual § 2255 motion for ineffective assistance of counsel motion.

4

The government also impugns Mr. Byrne's acceptance because he cannot recall with clarity incidents that occurred over 15 years ago. For example, the government is appalled that Mr. Byrne does not recall whether his admitted relationship with Victim 1 began before or after he moved into their home. Gov't Sent'g Ltr. at 15. This conduct occurred in 2006, close to *20 years* ago. Mr. Byrne does not deny the conduct, but cannot recall the exact months and years that it took place. If the government had wanted him to recall exact months and years of various conduct, the government should have arrested and prosecuted this case years ago. The discovery indicates that Victim 2 discussed the offense conduct with the federal government in 2014, but charges did not materialize for eight years. The federal government dragged its feet – but now blames Mr. Byrne for his imperfect recollection.

   c. *The government urges this Court to ignore Mr. Byrne's impeccable record from 2009 through the present.*

The government dismisses Mr. Byrne's strongest argument – that he has not participated in any illegal conduct regarding minors since 2009. The government attempts to undermine this argument by saying that he held himself out as a police officer and that he should have realized his wrongdoing sooner. This argument is patently obvious and should be afforded no weight. Like all criminal defendants, he should have realized his wrongdoing before engaging in the charged conduct, but he did not. And so he is facing federal charges and will spend years in prison because of it.

The pertinent question for the Court is whether Mr. Byrne has been rehabilitated, deterred, and incapacitated. He spent well over a decade in the community with nary a whisper of improper conduct regarding minors, thus the Court can be assured that he will not recidivate. The Court can – indeed must – take into account his faultless record between then and now.

## 4. Mr. Byrne's pretrial detention has been more punitive than it would have been had he simply self-surrendered to a BOP facility.

After his September 14, 2022 arrest in Florida, the Marshals transferred him to New York via the Oklahoma Transfer Center. There, he contracted COVID-19 and was waylaid for almost two months. His transfer took so long that the government had to call the Marshals to inquire as to his whereabouts.

When he finally reached New York on November 7, 2022, almost two full months after his arrest, he was housed at Westchester County Jail. Although COVID-19 was slowly receding, the jail was slow to lift restrictions. Mr. Byrne and his fellow inmates were locked down for much of each day. Cleaning supplies were scarce. Medical care was limited. When Mr. Byrne developed a butterfly rash across his face,

a telltale sign of lupus, the medical staff waited weeks to bring him to a doctor. Now, he is still waiting to see an ENT for constant ear pressure and jaw pain.

To add insult to injury, the bathrooms are covered in mold and, often, filled with flies and cockroaches. The food is hardly edible, but even if Mr. Byrne wanted to eat it, he cannot eat most of it because his jaw has a limited range of motion.

About three months ago, Mr. Byrne was transferred from Westchester County Jail to Hudson County Correctional Center in New Jersey. This jail brought a whole new slew of issues, but some constants remained: inadequate medical care, terrible food, and appalling conditions. And after he is sentenced, he will again be moved, probably to MDC, where two inmates murdered—just in the past month.

In fashioning a sanction, the Court should take into account the multiple transfers and accompanying indignities inherent in Mr. Byrne's pretrial detention, which has been far more punitive than direct self-surrender to a BOP facility.

## CONCLUSION

Mr. Byrne's last 16 years demonstrate that he has fulfilled most sentencing goals. He rehabilitated himself. He has been deterred, as evidenced by the years since his last offense. The general community has also been deterred because Mr. Byrne was in the community for over a decade, arrested years later, and held without bond at age 58. That scenario would deter anyone from engaging in similar conduct because it makes clear there is no statute of limitations. Further, he does not need to be incapacitated. If he did, surely the government would have arrested him in 2014, when this first came to light.

This case comes down to retribution: what amount of time is sufficient but not greater than necessary based on the 3553(a) factors? A sentence of 7 years, plus supervision, plus a first felony conviction, plus the sex offender registry (and all the shame that entails), is sufficient but not greater than necessary in this case, which is unique in its delayed prosecution, the dearth of any criminal activity since 2008, and the defendant's age and health issues.

Sincerely,

Rachel Martin, Esq.
Assistant Federal Defender

cc: Marcia Cohen, Esq.